**E-FILED**
Tuesday, 31 March, 2009  10:17:29 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

GREGORY W. ISHMAEL,              )
                                 )
                  Plaintiff,     )
                                 )
        v.                       )        No.  07-3209
                                 )
MICHAEL J. ASTURE, Commissioner  )
of Social Security,              )
                                 )
                  Defendant.     )

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Gregory Ishmael appeals from a final decision of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423(d).  Ishmael brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  <u>Plaintiff's Motion for Summary Judgment (d/e 11)</u>; <u>Defendant's Motion for Summary Affirmance (d/e 13)</u>.  For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence.  The SSA's Motion for

Summary Affirmance is therefore allowed, and Ishmael's Motion for Summary Judgment is denied.

<u>STATEMENT OF FACTS</u>

A.    <u>MEDICAL HISTORY</u>

Ishmael was born on September 21, 1959.  He is a high school graduate and has past relevant work experience as a farm worker, construction worker, and electrical helper.  Ishmael contends that he became disabled in January 2003 due to rheumatoid arthritis.  In April 2003, Ishmael saw Physician Assistant Marissa Cowell, complaining of extreme pain in his right big toe that extended about midway into his foot.  <u>Administrative Record (d/e 7) (A.R.)</u> at 224.  Ishmael told Cowell that he had trouble sleeping the night before and that "[t]his started about 4-5 days ago."  <u>Id</u>.  Ishmael's doctor, Dr. Mark McKay, thought that Ishmael may have had gout in his hand in the past.  Ishmael stated that he basically woke up one morning with the toe pain and thought that he may have injured the toe in the night.  Ishmael had attempted to ice the toe, but it hurt too much to put pressure on it.   Ishmael reported taking no over-the-counter medications.  Cowell observed that Ishmael walked with a slight limp.  Her examination of the big toe revealed some edema, erythema, slightly

2

increased warmth, and somewhat limited range of motion in the affected joints and Ishmael's foot in general.  Cowell described Ishmael's foot as "extremely tender to the touch."  Id.  Cowell assessed the condition as a "[l]ikely acute gouty episode."  Id.  She prescribed Naproxen for ten days, rest, icing of the toe if possible, and Vicodin for pain.  Cowell ordered uric acid labs and discussed diet factors with Ishmael, at which point he agreed to increase his fluid intake.

On May 28, 2003, Ishmael visited Dr. McKay, complaining of multiple joint pains.  A.R. at 218.  Ishmael reported that his toe was not really any better, but that Naproxen seemed to help in the short term.  When asked to be specific, Ishmael stated that both of his feet hurt "all along the arch" and that he felt "a little pins and needles sensation in that area when he first gets up in the morning" which gradually wears out over the course of the day.  Id.  Ishmael also complained of intermittent pain and swelling in his right hand proximal interphalangeal or PIP joints.  Ishmael stated that he did a lot of hammering and sawing during the course of the day, but had switched to a fiberglass hammer, which "helped him a lot."  Id.  Dr. McKay noted that Ishmael had been taking Allopurinal since April and trying to watch his diet.  According to Ishmael, fish seemed to trigger his

joint problems.  Dr. McKay noted that Ishmael appeared well, with no acute distress.  He noted mild swelling and erythema and minimal swelling on the left foot.  Ishmael exhibited point tenderness over the plantar fascia and mild to moderate swelling on the right hand.  Dr. McKay noted a mildly decreased range of motion.  Dr. McKay opined that Ishmael had possible gout, bilateral plantar fasciitis, and right hand pain resulting from overuse or possible osteoarthritis.  Dr. McKay prescribed Indomethacin, ordered an arthritis panel, and scheduled a follow up full physical.

Ishmael returned to Dr. McKay on June 4, 2003, for a visit that lasted forty to forty-five minutes overall.  A.R. at 217.  The lab results revealed an elevated rheumatoid factor of 218, but were otherwise negative.  Dr. McKay noted that Ishmael was "quite freaked out that he might have rheumatoid arthritis."  Id.  Ishmael reported that the Indomethacin helped a lot initially, but that he then overdid it physically, working twelve to fourteen hours the previous Friday, which resulted in a couple days of pain all over.  According to Ishmael, his feet were "much better" with the Indomethacin, but his hands and other locations continued to cause difficulties.  Id.  Ishmael reported that, when he sits, he stiffens up, so he "tries to keep going."  Id.  The longer Ishmael slept, the more pain he would experience in the

morning.  Ishmael stated that his mind raced at night and he was unable to get comfortable because of the pain.  Ishmael, however, did not want medication to help him sleep.  Ishmael reported that he wanted to quit smoking, but due to stress, he was smoking two packs of cigarettes a day. He had cut down on the amount of food that he ate and had reduced his soda consumption from twelve cans a day to two cans a day.

Dr. McKay noted that Ishmael weighed 206 pounds.  Ishmael exhibited a normal range of motion in all joints, normal gait, and no anxiety or depression.  Dr. McKay assessed Ishmael as having possible rheumatoid arthritis, tobacco abuse, elevated blood pressure that was possibly stress related, tachycardia that was likely stress related, insomnia, and obesity.  Dr. McKay referred Ishmael for evaluation on arthritis and possible Prednisone prescription.  He also advised Ishmael to take an aspirin a day, to continue with the Indomethacin, and to get involved in a smoking cessation program.

On July 2, 2003, Ishmael saw Dr. Jeffery Horvath.  Ishmael reported that two years prior he began having what Dr. Horvath characterized as "intermittent episodes of palindromic arthritis effecting [sic] the right hand, elbows, shoulders, feet, and ankles that would last for a few days and then resolve."  A.R. at 213.  Ishmael reported that, three to six months prior, it

got to the point where the arthritis was persisting, and he experienced persistent pain, swelling, and stiffness. Ishmael explained that he felt the worst in the morning and also by 5:00 or 6:00 p.m. He reported morning stiffness for about an hour and significant functional difficulties working and making a fist. Ishmael told Dr. Horvath that he was a self-employed contractor. Ishmael reported occasional paresthesias in the hands and trouble sleeping due to pain. Ishmael denied any depression. Dr. Horvath noted that Ishmael was in obvious discomfort during the examination. Ishmael exhibited reduced grip strength, but normal gait. Both of Ishmael's wrists were swollen, but they had a good range of motion with mild tenderness. The shoulders exhibited mild tenderness at extreme internal rotation. The knees exhibited a full range of motion without tenderness. Both ankles revealed trace synovitis, or inflammation of the joint-lining membrane, with tenderness upon range of motion. Dr. Horvath noted "some obvious osteoarthritic changes" in Ishmael's feet along with some synovitis. A.R. at 214. Dr. Horvath decided to discontinue Allopurinol and Indocin and "due to his significant synovitis and functional limitation," started Ishmael on Prednisone. Id. Dr. Horvath also prescribed Azulfidine and directed Ishmael to follow up with him in a month.

Ishmael returned to see Dr. Horvath on August 4, 2003.  A.R. at 212. Dr. Horvath noted that Ishmael was "getting along pretty well" and "feeling significantly better in terms of less pain, stiffness, and swelling."  Id. Ishmael reported two or three bad days a week, during which he experienced more pain, stiffness, and swelling primarily in his hands, wrists, and feet. Dr. Horvath observed trace synovitis in both of Ishmael's hands.  The right hand and right wrist both exhibited trace tenderness, but the wrist showed good range of motion.  The shoulders and elbows revealed good range of motion with no synovitis or tenderness.  The right ankle exhibited some tenderness with range of motion, but no synovitis.  There was possible trace synovitis in the left first and second toes.  Dr. Horvath directed Ishmael to continue with his medications and to follow up in two months.

Ishmael saw Dr. Horvath again on October 7, 2003.  A.R. at 209.  Dr. Horvath noted that Ishmael was tolerating his medications without difficulties and was "feeling better despite having achiness."  Id.  Ishmael reported that he was stiff in the morning but that it was "better."  Id.  Dr. Horvath noted that Ishmael's swelling was almost resolved and his pain was down.  Ishmael still described an achiness which he attributed to work.  Dr. Horvath noted trace tenderness in three PIPs but recorded that all other

joints were benign. Dr. Horvath directed Ishmael to continue with his medications and to follow up in two months.

Ishmael saw Dr. Horvath for follow up on December 8, 2003. <u>A.R.</u> at 208. Ishmael reported continued stiffness that lasted all morning primarily in his hands, but also in the right shoulder and right ankle, and occasional discomfort in the lower back. Dr. Horvath noted that the swelling was much improved, but there was arthralgias, or non-inflammatory joint pain, in the hands. Dr. Horvath noted trace synovitis in the right ankle, but stated that all other joints were benign. Dr. Horvath directed Ishmael to continue with his medications and added a prescription for Plaquenil.

Ishmael returned for follow up with Dr. Horvath on February 2, 2004. <u>A.R.</u> at 204. Ishmael initially reported diarrhea with the Plaquenil, but was tolerating it better by this point. Ishmael reported diffuse arthralgias with morning stiffness and that he was feeling quite poorly. Dr. Horvath noted that Ishmael's slightly elevated liver enzymes and alcohol consumption precluded Methotrexate or Arava therapy, which would typically be the next treatment step. Dr. Horvath noted polysynovitis in Ishmael's hands, but noted that all other joints were benign. Ishmael was directed to continue with his medications.

On April 5, 2004, Ishmael had a follow up appointment with Dr. Horvath. <u>A.R.</u> at 201. Ishmael reported considerable arthralgias, pain, and an hour's worth of morning stiffness, primarily in the hands and feet. Ishmael had been "quite active on the tractor" that day and was a little bit more sore than normal. <u>Id</u>. Dr. Horvath again noted trace synovitis in Ishmael's hands, but stated that all other joints were benign. Dr. Horvath directed Ishmael to continue with his medications and noted that they would begin filling out forms in an attempt to get approval from Ishmael's insurance company to begin Enbrel therapy in lieu of Methotrexate or Arava.

On June 1, 2004, Ishmael had another follow up appointment with Dr. Horvath, after taking Enbrel for about a month. <u>A.R.</u> at 199. Ishmael reported no major reactions or side effects from the Enbrel injections. Ishmael reported that the Enbrel had taken away a lot of his swelling, but that he still experienced a lot of arthralgias and morning stiffness. Ishmael had just returned from Canada where he had done well fishing for walleye. Dr. Horvath noted some osteoarthritic changes in Ishmael's hands, but no real synovitis. His wrists were full, but Ishmael had a good range of motion throughout without tenderness in the wrists, elbows, shoulders, hips, knees,

feet, and ankles.   Dr. Horvath characterized Ishmael as having "slight improvement on Enbrel therapy."  Id.  Dr. Horvath directed Ishmael to continue with his medications and to return for follow up in two months at which time Dr. Horvath hoped to taper Ishmael off of some of the medications.

At a follow up visit on August 9, 2004, Dr. Horvath noted that Ishmael still experienced arthralgias and had myalgias, or muscle pain, in the arms and legs.  A.R. at 196.  Ishmael reported that one knuckle on his right hand had swelled over the weekend, but then returned to normal.  He reported stiffness for only thirty minutes, presumably in the morning. Ishmael reported fatigue.  He stated that he fell asleep after work and would only sleep about one and a half hours during the night, during which time he would snore and occasionally stop breathing.  Dr. Horvath noted that Ishmael's joints exhibited a good range of motion throughout without tenderness or synovitis.  Dr. Horvath suspected that another underlying process, possibly sleep apnea, was contributing to Ishmael's fatigue.  Dr. Horvath cut back some of Ishmael's medication and referred him for a sleep study.

Ishmael saw Dr. McKay in November 2004 for a physical.  A.R. at

194.  Dr. McKay noted a normal range of motion in all joints, a normal gait, and no anxiety or depression.  Ishmael returned to Dr. Horvath in January 2005, after having taken Enbrel for about six months.  A.R. at 186.  Ishmael reported that the Enbrel had helped him.  While Ishmael still experienced achiness, a lot of the swelling and inflammation had resolved until the week prior when, after a change in the weather, Ishmael experienced an incident of swelling in his hands, feet, ankles, and knees.  Ishmael reported increased arthralgias and swelling since cutting back on the Prednisone.  Dr. Horvath noted a good range of motion throughout Ishmael's joints, without much synovitis, but maybe a little bit of tenderness in the hands.  Dr. Horvath adjusted Ishmael's medications and ordered follow up in the summer.  In a letter, dated January 9, 2005, Dr. Horvath informed Ishmael that his blood work revealed normal results and there was evidence that the Enbrel was working.  A.R. at 185.

Ishmael visited Dr. McKay on April 1, 2005, complaining that he felt more tired than usual over the past couple weeks and had been experiencing nausea and vomiting every other day.  A.R. at 184.  Ishmael reported that his rheumatoid arthritis was "improved a fair amount."  Id.  Ishmael stated that he had been experiencing a ringing in his ears for a week.  Dr. McKay

ordered labs and referred Ishmael to Dr. Mark Harrison for gastrointestinal evaluation, which was completed on April 6, 2005.  A.R. at 178.  In a note dated April 18, 2005, Dr. McKay indicated that Dr. Horvath was concerned that Ishmael had some underlying depression or secondary fibromyalgia. A.R. at 176.  Dr. Horvath also indicated concern about possible need for a formal sleep study.  Dr. McKay decided to ask Ishmael to come back into the office to discuss possible depression versus sleep abnormality.  Ishmael saw Physician Assistant Cowell on May 24, 2005, and was diagnosed with likely viral gastroenteritis.  A.R. at 170.

Ishmael had a follow up appointment with Dr. Horvath on July 19, 2005.  A.R. at 168.  Dr. Horvath noted that Ishmael was tolerating Enbrel without any problems and feeling better than he was when Dr. Horvath last saw him.  Dr. Horvath noted that Ishmael had seen Dr. McKay regarding his "mood" and that Dr. McKay did not prescribe antidepressants, but did order a sleep study.  Id.  Ishmael canceled the sleep study appointment because his daughter was being married that day, but it was due to be rescheduled.  Ishmael stated a belief that his sleep problems were pain-related, and Dr. Horvath offered him additional medication.  Ishmael responded that "as long as he drinks four beers, he is able to sleep better at

night and he does not wish to take anymore medication." Id.  Dr. Horvath

noted that Ishmael continued to have arthralgias in the arms and back when

driving and that he felt fatigued.  Ishmael reported that he had difficulty

doing the work that he used to do and was seeking an attorney to file for

disability.  Ishmael reported no swelling and no hand problems and that his

morning stiffness lasted less than an hour.  Ishmael's joints exhibited a good

range of motion throughout without tenderness or synovitis.  Dr. Horvath

noted that Ishmael exhibited a depressed affect.  Dr. Horvath opined that

Ishmael's fatigue and various arthralgias and myalgias were most likely

related to underlying depression.

Ishmael returned to Dr. Horvath for follow up on November 25, 2005.

A.R. at 167.  Dr. Horvath again noted that Ishmael was tolerating the

Enbrel without side effects.  Ishmael reported that he had been experiencing

more swelling and discomfort with the colder weather.  On the day of the

exam, Ishmael reported feeling a little bit achy, but exhibited no significant

swelling or stiffness.  Ishmael continued to exhibit a depressed affect and

had not had the sleep study.  Dr. Horvath noted a good range of motion

throughout Ishmael's joints without tenderness or synovitis.  Dr. Horvath

characterized Ishmael's rheumatoid arthritis as "stable on Enbrel therapy."

Id.  Dr. Horvath opined that Ishmael was suffering from depression or a non-restorative sleep disorder.  Dr. Horvath recommended that Ishmael speak with Dr. McKay and follow up with the sleep study.

Ishmael visited Dr. McKay on November 30, 2005.  A.R. at 161.  Dr. McKay assessed Ishmael as having inadequately controlled hypertension, elevated glucose that was likely steroid induced, possible sleep apnea, reflux, and headaches.  Dr. McKay prescribed Prilosec and Lisinopril and advised Ishmael to stop drinking alcohol.  Ishmael saw Dr. McKay again in February 2006 complaining of a three week history of cough.  A.R. at 159.  At that time, Dr. McKay noted that Ishmael exhibited improved control of his hypertension.

In March 2006, Ishmael visited Dr. Horvath for follow up.  A.R. at 158.  Ishmael reported that he had not felt well for the past year.  He reported morning stiffness lasting thirty to forty-five minutes, swelling in his hands, and pain to the extent that he was limping.  Ishmael stated that "[h]e basically hurts all over" and that "the Enbrel just does not seem to be working as well."  Id.  Dr. Horvath noted some hypertrophic changes in the PIP joints with some tenderness but no definite synovitis.  Dr. Horvath noted some additional fullness across the hands, but no definite tenderness

or synovitis.  Ishmael's wrists, elbows, and shoulders exhibited good range of motion without tenderness or synovitis and his hips exhibited a good range of motion without tenderness.  The knees revealed some tenderness with range of motion, but no synovitis.  Ishmael's feet and ankles revealed some tenderness without synovitis.  Dr. Horvath noted questionable depression with nonrestorative sleep disorder.

Ishmael visited Dr. McKay in June 2006 and indicated that he was losing faith in Dr. Horvath.  A.R. at 232.  Ishmael reported that he was fairly sore when he gets up in the morning, but that overall he was doing better than he was before he began treatment.  Dr. McKay advised Ishmael to stick with Dr. Horvath and rescheduled the sleep study.  The sleep study was conducted in August 2006.  A.R. at 229.  Ishmael had a total sleep time of 427 minutes with a slightly reduced sleep efficiency of 88%.  A.R. at 230.  He exhibited short sleep latency which was indicative of pathologic daytime sleepiness.  The study revealed that Ishmael suffered from severe obstructive sleep apnea, but that he had good resolution with the application of CPAP therapy.

Ishmael visited Dr. Horvath in October 2006.  A.R. at 233.  Ishmael reported that he had experienced swelling in his hands that had resolved.

Ishmael also stated that he did not feel as achy due to Flexeril. Ishmael reported that the CPAP therapy was helping him sleep better and that he was feeling better overall. Dr. Horvath noted a good range of motion throughout Ishmael's joints without tenderness or synovitis. Dr. Horvath characterized Ishmael's rheumatoid arthritis as stable and his sleep apnea as improved on CPAP.

In December 2006, Ishmael went to Dr. McKay's office complaining of neck and left shoulder pain that had been going on for some time. A.R. at 240. An x-ray of the neck revealed some prominent bony spurring. A.R. at 242. Ishmael was sent to physical therapy for evaluation and treatment.

Ishmael returned to Dr. Horvath on February 1, 2007. A.R. at 243. Ishmael reported morning stiffness for an hour, swelling in the hands, and fatigue. Ishmael stated that he had turned his business over to his son, was feeling "bummed out," and was not sleeping well. Id. Ishmael's joints exhibited some tenderness, but no synovitis. Dr. Horvath explained to Ishmael that he felt that the current pain was not related to rheumatoid arthritis, but rather to some other problem such as depression, myofascial pain (chronic muscle pain), or fibromyalgia. Lab results revealed an elevated rheumatoid factor, however. A.R. at 245.

16

B.    <u>ADMINISTRATIVE HEARING</u>

On February 23, 2004, Ishmael applied for DIB.  He alleged disability beginning January 5, 2003.    His claim was denied initially and on reconsideration on September 16, 2004.  On November 9, 2004, Ishmael filed a timely request for an administrative hearing.  The Administrative Law Judge (ALJ), David W. Thompson, presided over a video hearing on December 18, 2006.  Ishmael appeared with counsel.  The ALJ heard testimony from Ishmael and Bonnie Gladden, a vocational expert.

Ishmael testified as follows.  At the time of the hearing, he was forty-seven years old and married with two adult children.  He lived in a one-story house with his wife and his twenty-four year old son.  Ishmael is 5' 8" tall. He reported a current weight of 214 pounds, stating that his weight had gone up about eight pounds in the past year.  Ishmael testified that he drove to the hearing, which took him about an hour, but that he stopped for a twenty minute break along the way because his neck and legs were "feeling sore and stiff."  <u>A.R.</u> at 258.

Ishmael testified that, at the time he stopped working, he was working about seven hours a week on a bird farm and also selling satellite systems with his son for six or seven hours a week.  Ishmael's work at the bird farm

consisted of using a garden hose to fill a water trough.  <u>A.R.</u> at 270.  The farm was owned by Ishmael's friend, who knew about the medical problems he was experiencing.  With respect to the satellite systems, Ishmael stated that he only sold the systems and did not install them.  Ishmael testified that he stopped working full-time in January 2003 because his arms, hands, and right ankle were swelling and he could not put on his shoes.  <u>A.R.</u> at 261.

Ishmael confirmed that, at the time of the hearing, he was taking Etodolac, Prednisone, and Humira for rheumatoid arthritis and Lisinopril for high blood pressure.  <u>A.R.</u> at 138, 261.  According to Ishmael, the medications slowed down the swelling, but "[t]he soreness and the ankles and the joint problems [were] still bothering a lot."  <u>A.R.</u> at 262.  Ishmael stated that depression medication had helped "quite a bit."  <u>Id</u>.  Ishmael reported the side effects from his medication as occasional upset stomach and dizziness.

Ishmael testified that he was unable to work because he could not hold onto things for a long period of time; walking and standing all the time bothered his legs and ankles; he got dizzy; and if he worked one day, he may not be able to work for the next two days because of swelling in his hands.

18

According to Ishmael, if he did yard work one day, the next day his ankles and wrist would swell and at least two of his knuckles would be swollen. Ishmael stated that the residual swelling usually lasted a day or two, but had lasted up to three days.

Ishmael stated that he had experienced an alcohol abuse problem in 2005, when he began drinking to help himself sleep better at night. Ishmael testified that he was smoking about a pack of cigarettes a day at the time of the hearing. Ishmael denied doing any yard work, participating in outdoor activities, or having any hobbies. He testified that he drove about ten miles a week. According to Ishmael, his wife bathed and dressed him about fifty to sixty percent of the time. Ishmael was able to feed himself, but his wife would cut up his meat. Ishmael testified that he did a very little bit of cooking in the microwave and did not do laundry, wash dishes, make the bed, or vacuum. Once in a while, Ishmael would walk through the store with his wife to do grocery shopping. Ishmael listened to the radio, watched about four hours of television a day, visited friends, relatives, or neighbors twice a month, and received visitors almost every weekend. Ishmael testified that he spent his day sitting in a recliner or squatting in front of it, sitting on the edge of the bed, and sitting at the kitchen table. Ishmael

explained that he would squat down by the recliner for a half an hour or longer with his legs underneath him, sitting on his feet, because this position relieved pressure on his legs and knees and made them feel better.  A.R. at 274-75.

Ishmael estimated that he could stand for half an hour before having to sit down and that he could walk around the block.  On a good day, Ishmael can sit for half an hour before having to stand up and move around. On a bad day, he can only sit for approximately twenty minutes.  Ishmael stated that he could lift a gallon of milk and carry it to the table.  Ishmael estimated that he could do this for a quarter to half a day.  When he drops something, Ishmael is "[s]ometimes" able to bend over and pick it up.  A.R. at 266.

Upon questioning by his attorney, Ishmael estimated that his normal adult weight was 185 pounds.  Ishmael attributed his higher current weight to his inability to get out and do things and to the Prednisone he had been taking for approximately four years.   Ishmael stated that his doctor attempted to reduce the amount of Prednisone he was taking but that his joints started swelling.

Ishmael testified that he experienced swelling in his joints on five out

of seven days and that the swelling moved around between his knees, shoulders, hands, ankles, and toes.  Ishmael stated that, on the day of the hearing, he was not experiencing much swelling, and he classified it as a "[t]ypical day."  A.R. at 268-69.  Although Ishmael was not experiencing swelling on the day of the hearing, he testified that he was experiencing pain in his hands, ankles and knee.  A.R. at 271.  Ishmael stated that the weather affected his condition and he experienced more pain when the barometric pressure was changing.

Ishmael testified that he generally woke up about 4:00 a.m. due to stiffness and aching.  He stated that he would remain in bed until about 5:30 a.m. to avoid waking his wife so early.  Ishmael testified that, occasionally, his wife has to pull him up to a sitting position in bed and position him on the side of the bed, where he will sit until he feels he can get up.  Ishmael estimated that, on those days, it takes him half an hour to get out of bed, at which point he is able to get up and move around some.

Ishmael testified that one day he attempted to help his son by typing on a computer.  After about twenty minutes, Ishmael's fingers started swelling up and the next day he could barely move his fingers.  Ishmael also stated that he had problems using small tools because his hand pain

21

prevented him from gripping tight enough to hold onto things.  Ishmael testified that he was no longer able to hold onto something as small as a screwdriver.  Ishmael stated that there were days in the spring of 2006 when he felt well enough to do things.  Ishmael testified that he mowed the yard for about twenty minutes.  According to Ishmael, he started out using a weed eater, but the vibrations from the machine "drove [his] arm insane" and he experienced really bad pain.  A.R. at 273.  Ishmael then tried to use a push mower but "that didn't work," so he then used the riding mower.  Id.  Ishmael testified that he used to hunt, and that he tried bird hunting with a twelve-gauge shotgun in the three or four years prior to the hearing, but that he gave it up because it involved too much walking and he did not feel comfortable carrying his gun.  A.R. at 274-75.

Ishmael stated that he experienced irregular sleep due to sleep apnea, but that a "C-pap" machine helped him "sleep some."  A.R. at 273.  Ishmael testified that he would wake up two or three times a night and that he did not feel refreshed when he got up in the morning.  Ishmael characterized his energy level as low.  In addition to his prescription medications, Ishmael testified that he had used Epsom salt in water and a whirlpool, which seemed to help and relaxed him so that he could sleep a little better.

22

Ishmael also reported using Advil.  A.R. at 274.

Vocational expert Gladden then testified.  The ALJ asked Gladden to assume an individual of the same age, education, and experience as Ishmael, who was limited to light work with the need to avoid concentrated exposure to hazards, heights, and vibration.  A.R. at 277.  Gladden testified that such an individual would be unable to perform Ishmael's past relevant work, which she characterized as either heavy or medium.  Considering other work, Gladden stated that the only transferrable skills would be some of the electrical skills, but that these skills were not transferable to light work.  A.R. at 278.  Thus, Gladden identified other jobs that were characterized as unskilled light work, as follows: inspector, tester, sorter, packing and filling machine operator, laborer-freight and stock material handler and hand packager.  According to Gladden, each of these jobs existed in significant numbers in the State of Illinois.  The ALJ then asked Gladden to assume that the hypothetical individual was also limited to occasional grasping and fingering.  Gladden testified that such an individual could work as a gate tender, which covered 8,200 positions in the State of Illinois.

The ALJ then asked Gladden to assume an individual who could perform only sedentary work with a sit/stand option who needed to avoid

concentrated exposure to hazards, heights, and vibrations.  According to Gladden, such an individual could perform the positions of material handler/laborer at the sedentary level, assembly work, and packing and filling machine operator at the sedentary level, which Gladden characterized as representative rather than exhaustive.  The ALJ then asked Gladden to consider an additional restriction of only occasional grasping and fingering. Gladden testified that no sedentary positions would be available with this added restriction.

Upon examination by Ishmael's attorney, Gladden testified that, if a person were to miss work three days in a given month, '[m]ore than likely job retention would be affected."  <u>A.R.</u> at 281.  Additionally, with respect to the gate tender position, Gladden testified that, if an individual was unable to lift more than ten pounds occasionally, this position would be precluded as well.

C.    <u>THE ALJ'S DECISION</u>

The ALJ issued his Decision on January 16, 2007, finding that Ishmael was not disabled from January 5, 2003, through the date of the Decision. <u>A.R.</u> at 6-21.  The ALJ reached this conclusion based on the five-step sequential evaluation process established by the SSA, which requires a

determination of whether the claimant: (1) is engaging in "substantial gainful activity;" (2) has a medically determinable impairment that is "severe;" (3) has impairments that meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"); (4) has the "residual functional capacity" to perform past relevant work; and (5) is able to do any other work considering the claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. § 404.1520.  For the first four steps, the claimant bears the burden of proof and of providing evidence.  On the last step, however, the burden shifts to the SSA to prove that other work that the claimant can perform exists in sufficient numbers in the national economy.  20 C.F.R. § 404.1520(g).

The ALJ concluded that Ishmael met his burden at steps one and two of the analysis, but that he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 (step three).  A.R. at 8-10.  In doing so, the ALJ characterized Ishmael's severe impairments as rheumatoid arthritis and spurring on the cervical spine.  The ALJ noted that the record contained occasional references to possible depression, but that no significant depressive complaints were voiced at the hearing or appear in the medical records and

25

Ishmael had not been encouraged to undergo any mental health treatment other than recent use of Fluoxetine.  The ALJ concluded that any depression would impose at most only mild functional limitations.  The ALJ noted that Ishmael's severe obstructive sleep apnea was significantly improved with CPAP therapy and that there was no reason to believe that sleep apnea would significantly impair Ishmael's ability to work.  The ALJ further noted that Ishmael's weight placed him in the obese category.  Ishmael asserted that he had gained weight in recent years due to the use of Prednisone and decreased activity.  The medical records, however, revealed that Ishmael weighed 206 pounds prior to his Prednisone use.  The ALJ concluded that Ishmael's obesity was a long-standing problem and one with which he had successfully worked.  Thus, the ALJ determined that obesity would not prevent Ishmael from performing basic work activities.

The ALJ then considered whether Ishmael retained the residual functional capacity to perform his past relevant work (step four).  He concluded that Ishmael retained the residual functional capacity to perform light work with no concentrated exposure to unprotected heights, hazardous machinery, or vibrations.  The ALJ found that Ishmael's medically determined impairments could reasonably be expected to produce the

symptoms that he alleged; however, the ALJ deemed Ishmael's statements concerning the intensity, persistence, and limiting effects of the symptoms to be not entirely credible.  After recounting the medical evidence, the ALJ identified several discrepancies in the record that he believed undermined Ishmael's credibility.  A.R. at 17-19.  The ALJ determined that the record evidence supported the conclusions set out in the September 3, 2004, Residual Functional Capacity Assessment, completed by a state agency consultant, with the additional limitation of no concentrated exposure to vibrations arising out of Ishmael's hearing testimony.  A.R. at 17, 19, 148.  Relying on the vocational expert's testimony, the ALJ found that Ishmael could not perform any past relevant work, which was all medium to heavy in nature.

The ALJ then determined that, considering Ishmael's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.  A.R. at 20.  In doing so, the ALJ relied on Gladden's testimony that an individual would be able to perform the requirements of inspector, tester, or sorter; packing and fitting machine operator; freight and stock laborer or material handler; hand packager; gate tender; or assembler.  Id.

27

The ALJ further noted that, even if an additional limitation of only occasional grasping and fingering was imposed, the gate tender position would remain available.  <u>A.R.</u> at 21.  The ALJ concluded that Ishmael was "not disabled" and, therefore, not eligible to receive DIB.

    D.   <u>THE APPEALS COUNCIL</u>

Ishmael filed a timely request for review to the Appeals Council which initially denied review on March 30, 2007.  <u>A.R.</u> at 28-30.  On June 7, 2007, the Council set aside its March 30, 2007, denial in order to consider additional information.  <u>A.R.</u> at 22.  The Council, however, found no reason to review the ALJ's decision and issued a final order denying review on that same date.  <u>A.R.</u> at 22-24.  Thus, the Decision of the ALJ became the final agency decision.  Ishmael then filed his timely Complaint (d/e 1).

<u>ANALYSIS</u>

A claimant is entitled to benefits if he or she establishes an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months.  This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence, and the Court may not re-weigh evidence, resolve conflicts in the

record, decide questions of credibility or substitute its own judgment for that of the ALJ.  Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must, however, at least minimally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all of the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).  The parties agree that Ishmael's date of last insured status for DIB is September 30, 2005.  Thus, he must establish disability on or before that date in order to qualify for DIB.

Ishmael asserts that the ALJ failed to adequately evaluate evidence relating to Ishmael's osteoarthritis, fatigue, probable fibromyalgia, depression, sleep apnea, and obesity.  First, Ishmael asserts that the ALJ unreasonably concluded that Ishmael had no impairment in hand and finger function.  According to Ishmael, manipulative limitations existed due to

29

rheumatoid arthritis and osteoarthritis.   The ALJ declined to assess manipulative limitations based on the fact that the record revealed only minimal synovitis and tenderness in the hands that, in his opinion, did not occur with sufficient frequency to justify manipulative limitations.  The ALJ noted that examinations in July and November 2005, which were close in time to Ishmael's date last insured, revealed no evidence of joint problems in the hands and fingers.   As the ALJ clearly recognized, the medical evidence revealed that Ishmael's rheumatoid arthritis responded well to treatment.   While Dr. Horvath noted some osteoarthritic changes in Ishmael's hands during a June 2004 examination, there is nothing to indicate that this condition was in any way limiting.  The only medical evidence on the subject, the September 3, 2004 Residual Functional Capacity Assessment completed by the state agency consultant, recognized no manipulative limitations.  A.R. at 151.  The ALJ's refusal to assess manipulative limitations is supported by substantial evidence.

Ishmael further asserts that the ALJ improperly discounted his complaints of fatigue.  The ALJ noted that the record contained occasional complaints of fatigue, but determined that the record lacked credible evidence that fatigue was a significant problem with any regularity.  A.R. at

30

19.  Ishmael argues that rheumatoid arthritis, sleep apnea, depression, and fibromyalgia could all reasonably be expected to produce fatigue.  Under 20 C.F.R. § 404.1529(b), symptoms, such as fatigue, will not be found to affect a claimant's ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment is present.

When the medical evidence reveals a medically determinable impairment that could reasonably be expected to produce symptoms, the ALJ must evaluate the intensity and persistence of the symptoms to determine how the symptoms limit the claimant's capacity for work.  20 C.F.R. § 404.1529(c)(1).  Under 20 C.F.R. § 404.1529(c)(3), the ALJ is directed to consider the following factors relevant to symptoms such as pain: daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, received for relief of the symptoms; any measures used to relieve the symptoms; and other factors concerning functional limitations and restrictions due to the symptoms.

The ALJ conducted a detailed analysis of Ishmael's rheumatoid

arthritis, specifically noting record evidence that reported improvement with medication.  A.R. at 11-16.  The ALJ cited Dr. Horvath's assessment in August 2004, that another underlying problem, possibly sleep apnea, was contributing to Ishmael's fatigue and his suspicion in July 2005, that the fatigue was related to depression.  See A.R. at 168, 196.  The ALJ's failure to impose limitations based on fatigue arising out of rheumatoid arthritis was supported by substantial evidence.

Ishmael's argument relating to sleep apnea is similarly unavailing.  The ALJ recognized that Ishmael had been diagnosed with severe obstructive sleep apnea, but noted medical evidence that Ishmael's condition responded well to CPAP therapy.  A.R. at 17.  The ALJ further noted that the diagnosis of sleep apnea was made well after the date that Ishmael was last insured. The ALJ's refusal to impose limitations based on fatigue relating to sleep apnea was supported by substantial evidence.

Turning to depression and fibromyalgia, the Court notes that there is no record diagnosis of either condition.  The ALJ noted occasional references to depression in the medical records, but recognized that the record was devoid of significant depressive complaints and that Ishmael had never undergone any formal mental health treatment.  A.R. at 17.  This

statement is supported by the record evidence.  Ishmael also asserts that the ALJ erred in failing to discuss fibromyalgia in his opinion.  However, as previously noted, there is no record diagnosis of fibromyalgia.  Ishmael himself recognizes this in his brief, where he references "the probable diagnosis of fibromyalgia."  Brief of Plaintiff, Gregory W. Ishmael (d/e 12), p. 12.  The ALJ did not err in failing to assess fatigue arising out of depression or fibromyalgia based on the lack of evidence that these conditions constituted medically determinable impairments.  20 C.F.R. § 404.1529(b).

Finally, Ishmael contends that the ALJ erred in failing to properly consider the effect of Ishmael's obesity on his other impairments, specifically his arthritis and sleep apnea.  The ALJ recognized that Ishmael's weight placed him in the obese category.  A.R. at 9.  As the ALJ correctly noted, medical records reveal that Ishmael weighed 206 pounds as of June 2003.  A.R. at 9, 217.  Thus, the majority of the relevant medical evidence arose out of a period during which Ishmael was obese.  There is no record evidence that Ishmael's obesity increased the severity of either his arthritis or sleep apnea.  Ishmael fails to identify any specific additional impairment relating to his obesity.  Again, the ALJ adopted the only medical evidence

relating to functional limitations, the September 3, 2004, Residual Functional Capacity Assessment completed by the state agency consultant, which was completed after Ishmael's obesity was medically documented. Although the ALJ did not expressly consider any exacerbating impact of Ishmael's obesity on his arthritis or sleep apnea, the issue was factored indirectly into the ALJ's Decision through the medical records and the Residual Functional Capacity Assessment.  See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004).

## CONCLUSION

For the reasons set forth above, Ishmael's claims of error fail.  The ALJ's Decision that Ishmael was not disabled is supported by the law and by substantial evidence.  Therefore, the Commissioner of Social Security's Motion for Summary Affirmance (d/e 13) is ALLOWED, and Plaintiff's Motion for Summary Judgment (d/e 11) is DENIED.  The Decision of the Commissioner of Social Security is AFFIRMED.  All pending motions are denied as moot.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   March 31, 2009

      FOR THE COURT:

                        _____ s/  Jeanne E. Scott _____
                                JEANNE E. SCOTT
                    UNITED STATES DISTRICT JUDGE